## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN KEENEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CV200 SNLJ(LMB) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Kevin Keeney for Supplemental Security Income under Title XVI of the Social Security Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 13). Defendant has filed a Brief in Support of the Answer. (Doc. No. 18). Plaintiff has filed a Reply. (Doc. No. 19).

## Procedural History

On March 16, 2009, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on October 19, 2003. (Tr. 116-18). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated January 4, 2011. (Tr. 49, 12-25). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social

- 1 -

Security Administration (SSA), which was denied on December 12, 2011. (Tr. 7, 1-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.   ALJ Hearing

Plaintiff's administrative hearing was held on November 16, 2010. (Tr. 33). Plaintiff was present and was represented by counsel. (Id.). Also present was Ashad Pushalani, medical expert; and Lori McQuaid, vocational expert. (Id.).

Plaintiff's attorney examined plaintiff, who testified that he had problems with his left shoulder, which caused him to experience constant pain. (Tr. 34). Plaintiff rated his shoulder pain as between an eight and nine on a scale of one to ten. (Id.). Plaintiff testified that he took pain medication daily, which helped somewhat. (Id.). Plaintiff stated that he experienced occasional stomach upset and drowsiness from his pain medication. (Id.). Plaintiff testified that he had limited range of motion in his left shoulder. (Id.). Plaintiff stated that he was able to lift ten to fifteen pounds, but not on a regular basis. (Id.).

Plaintiff testified that he experienced numbness in both of his hands and his feet. (Tr. 35). Plaintiff stated that he had arthritis, which affected his whole body. (Id.).

Plaintiff testified that he had decreased grip strength in his hands, and had difficulty writing, and holding objects. (Id.). Plaintiff stated that he did not think he was able to type because he also experienced cramps in his hands after ten to fifteen minutes of using his hands. (Id.).

Plaintiff testified that he has arthritis in his feet and in his knees. (Tr. 36). Plaintiff stated

that he has difficulty walking due to his problems with his feet and his knees.  (Id.).  Plaintiff

testified that he is able to walk about one hundred feet before he has to sit down.  (Id.).  Plaintiff

stated that he is able to sit in a chair comfortably for about fifteen minutes before he has to get up

and stand for about fifteen minutes.  (Id.).  Plaintiff testified that he has to lie down during the day

three to four times for twenty to twenty-five minute periods.  (Tr. 37).

Plaintiff stated that he has been diagnosed with schizophrenia.[1]  (Id.).  Plaintiff testified

that he likes to stay at home by himself due to his schizophrenia.  (Id.).  Plaintiff stated that he

believes people are watching him, and he has experienced hallucinations.  (Id.).  Plaintiff testified

that he takes medication for schizophrenia, which keeps his symptoms under control "most of the

time."  (Id.).

Plaintiff stated that he also experiences anxiety.  (Id.).  Plaintiff testified that he has

difficulty being around people, and being in new situations.  (Id.).  Plaintiff stated that he was

experiencing anxiety at that time due to the hearing.  (Id.).  Plaintiff stated that he has panic

attacks, during which he experiences shortness of breath, at least once a day.  (Id.).  Plaintiff

testified that he was taking medication for the anxiety, which was not helping during the hearing.

(Tr. 39).

Plaintiff stated that he has difficulty with his memory.  (Id.).  Plaintiff testified that most of

his difficulties are with regard to his short-term memory, although he has some problems with his

long-term memory as well.  (Id.).  Plaintiff stated that he has to write himself notes or he will

---

[1]A common type of psychosis characterized by abnormalities in perception, content of
thought, and thought processes (hallucinations and delusions) and by extensive withdrawal of
interest from other people and the outside world, with excessive focusing on one's own mental
life.  Stedman's Medical Dictionary, 1729 (28th Ed. 2006).

forget things.  (Id.).

Plaintiff testified that he has difficulty focusing and concentrating.  (Id.).  Plaintiff stated that he is unable to watch a one-hour-long television program, because he has to get up and walk around.  (Id.).  Plaintiff testified that he has difficulty completing tasks because he forgets things in the middle of the task.  (Tr. 40).  Plaintiff stated that he would have difficulty following instructions.  (Id.).

The ALJ examined medical expert Dr. Pushalani, who testified that he was a board certified psychiatrist.  (Tr. 41).  Dr. Pushalani stated that he had not examined plaintiff, but he read the medical data concerning plaintiff given to him by the Social Security Administration. (Id.).  Dr. Pushalani testified that plaintiff has a history of extensive alcohol and marijuana usage, and that he has been diagnosed as having alcohol dependency, in remission; mood disorder; major depressive disorder;[2] bipolar disorder;[3] generalized anxiety disorder;[4] and post-traumatic stress disorder.[5]  (Tr. 41-42).  Dr. Pushalani stated that plaintiff has not been diagnosed with schizophrenia.  (Tr. 42).  Dr. Pushalani testified that plaintiff's treating psychiatrist had indicated

---

[2]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  Stedman's at 515.

[3]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes.  Stedman's at 568.

[4]A psychological disorder in which anxiety or morbid fear and dread accompanied by autonomic changes are prominent features.  Stedman's at 569.

[5]Posttraumatic stress disorder ("PTSD") is the development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently reexperiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, and a variety of autonomic and cognitive dysfunctions.  Stedman's at 570.

that plaintiff was doing reasonably well, although he had some limitations, most of which were moderate.  (Id.).  Dr. Pushalani stated that the most recent records reveal diagnoses of major depressive disorder, generalized anxiety disorder, alcohol dependancy in remission, marijuana use in remission, and a GAF score[6] of 65.[7]  (Id.).  Dr. Pushalani testified that it appears that plaintiff has predominantly a mood disorder, which was exacerbated by his use of alcohol and marijuana, and that he has been stable since he has maintained his sobriety.  (Tr. 43).

Dr. Pushalani testified that he considered the listings for affective disorders (12.04) and anxiety disorders (12.06).  (Id.).  Dr. Pushalani stated that plaintiff has mild restrictions of activities of daily living, moderate limitations in social functioning, and mild limitations in his ability to maintain concentration, persistence, or pace.  (Id.).  Dr. Pushalani testified that plaintiff has moderate limitations in his ability to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions; and mild limitations in his ability to interact appropriately with the public, interact appropriately with coworkers, respond appropriately to usual work situations, and respond to routine changes to the work setting.  (Tr. 44).

The ALJ then examined the vocational expert, Lori McQuaid, who testified that plaintiff's

---

[6]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[7]A GAF score of 61-70 denotes "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32

past relevant work was characterized as night stocker in a grocery store, which was heavy and semi-skilled. (Tr. 45). Ms. McQuaid stated that plaintiff's construction labor work was medium and semi-skilled. (Id.).

The ALJ asked Ms. McQuaid to assume a hypothetical claimant with plaintiff's characteristics and the following limitations: must alternate between sitting and standing at will; lift up to twenty pounds occasionally and ten pounds frequently; no heights or climbing; no moving or dangerous equipment; no repetitive overhead reaching; and no repetitive pushing and pulling with the arms. (Id.). Ms. McQuaid testified that the hypothetical claimant would be unable to perform plaintiff's past work. (Id.). Ms. McQuaid stated that the individual would be able to perform other jobs, such as ticket seller (3,000,000 jobs nationally, 2,500 jobs locally); office helper (200,000 jobs nationally, 200 locally); and small products assembler (900,000 nationally, 500 locally). (Tr. 46).

Ms. McQuaid testified that the hypothetical individual could perform the jobs she mentioned if he had moderate limitations in performing complex work as described by Dr. Pushalani. (Id.). Ms. McQuaid stated that the jobs she described were unskilled. (Tr. 47).

Plaintiff's attorney questioned Ms. McQuaid, who testified that an individual with the additional limitation of a need to lie down three to four times during the workday for twenty minutes each would be unable to maintain employment longer than thirty to forty-five days. (Tr. 47-48).

## B.    Relevant Medical Records

Plaintiff presented to John S. Pearson, D.O. on May 9, 2005, with complaints of right elbow pain since 1993, when he fell two stories. (Tr. 232). Plaintiff reported difficulty carrying

things and grasping.  (Id.).  Plaintiff underwent x-rays of the right elbow, which revealed no acute

injury.  (Tr. 240).  Dr. Pearson diagnosed plaintiff with right medial epicondylitis.[8]  (Id.).

Plaintiff presented to the emergency room at Phelps County Regional Medical Center on

June 3, 2005, with complaints of left shoulder pain related to a fall.  (Tr. 222-23).  Plaintiff

underwent x-rays of the left shoulder, which revealed findings suggestive of scapula fracture.  (Tr.

221).

Plaintiff saw Dr. Pearson on June 23, 2005, for follow-up regarding his elbow and left

shoulder.  (Tr. 231).  Plaintiff's right elbow had resolved "quite nicely."  (Id.).  Plaintiff's left

shoulder was still sore, but he was doing much better, and had good range of motion of the

shoulder.  (Id.).  Dr. Pearson's assessment was right medial epicondylitis and left shoulder trauma,

resolving.  (Id.).

Plaintiff saw Dr. Pearson for follow-up on August 2, 2005, at which time plaintiff reported

that he was still experiencing shoulder pain.  (Tr. 230).  Upon examination, Dr. Pearson noted

tenderness along the scapular wing, and plaintiff was unable to maintain his shoulder in abduction

at ninety degrees against any force at all.  (Id.).  Dr. Pearson's assessment was left scapular wing

fracture, left shoulder pain.  (Id.).  He recommended an MRI of the left shoulder.  (Id.).  On

September 15, 2005, Dr. Pearson stated that the MRI revealed tendinitis,[9] but no evidence of a

tear.  (Tr. 229).  Dr. Pearson recommended an orthopedic consult.  (Id.).

Plaintiff received treatment from Allen E. Northern, D.O. from May 4, 2007 through

---

[8]Epicondylitis, also referred to as golfer's elbow, is the inflammation of an epicondyle.  It causes pain on the inner side of the elbow where the tendons of the forearm muscles attach to the bony bump on the inside of the elbow.  See Stedman's at 653.

[9]Inflammation of a tendon.  Stedman's at 1944.

December 12, 2007, for complaints of right elbow pain and leg cramps. (Tr. 241-46).

Plaintiff presented to Thomas J. Spencer, Psy.D., on March 27, 2009, for a psychological evaluation. (Tr. 247-50). Plaintiff reported that he was "moody," and occasionally experienced blackouts. (Tr. 247). Plaintiff also reported difficulty with short-term memory. (Id.). Plaintiff reported a history of alcohol abuse, and indicated that his last drink was one month prior. (Id.). Plaintiff also noted a history of marijuana and methamphetamines but claimed no use for fourteen years. (Id.). Plaintiff indicated that he periodically felt paranoid of others, and "sometimes" felt depressed. (Id.). Plaintiff had received no psychiatric treatment, other than one contact with a psychologist over twenty years prior through vocational rehab. (Tr. 248). Upon examination, plaintiff's mood was "kinda nervous," his affect was anxious, his flow of thought was intact and organized, and his insight and judgment were questionable. (Tr. 249). Dr. Spencer diagnosed plaintiff with alcohol dependence (early remission, per plaintiff), mood disorder NOS, and a GAF score of 50 to 55.[10] (Tr. 250). Dr. Spencer stated that plaintiff has a mental illness, although one that does not necessarily interfere with his ability to engage in employment. (Id.). Dr. Spencer stated that a strong possibility exists that plaintiff's blackout episodes are organic in nature due to plaintiff's history of head injuries and alcohol abuse. (Id.).

Plaintiff received treatment at St. John's We Care Clinic on March 3, 2009, for treatment of hypertension and schizophrenia. (Tr. 252). Plaintiff was prescribed Cymbalta.[11] (Id.). It was

---

[10]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32. A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 32.

[11]Cymbalta is indicated for the treatment of major depressive disorder and generalized anxiety disorder. See Physician's Desk Reference ("PDR"), 1801 (63rd Ed. 2009).

noted that plaintiff's blood pressure was much better, although he needed better control. (Id.).

On April 28, 2009, plaintiff complained of toe and leg cramping. (Tr. 251). Plaintiff was

diagnosed with nocturnal leg cramps and tinea pedis[12]-severe. (Id.).

Plaintiff presented to Southeast Missouri Mental Health Center on August 26, 2009, with

complaints that he gets "goofy" sometimes, and paranoid. (Tr. 317). Plaintiff reported that he

had had feelings of someone watching him for two years, screams during his sleep, experiences

black outs, and had a labile mood. (Id.). Plaintiff reported that he had not used alcohol in about

three months; and he had last used marijuana sometime that year. (Tr. 319). Upon examination,

plaintiff's mood was described as "ok," his affect was mood congruent, and his form of thought

was logical. (Tr. 322). Plaintiff was diagnosed with anxiety disorder NOS; history of marijuana

and alcohol abuse; rule out substance induced mood disorder; and a GAF score of 65. (Tr. 323).

Plaintiff was prescribed Vistaril[13] and was advised to refrain from drug and alcohol abuse. (Id.).

A social worker scheduled an intake at Pathways. (Id.).

Plaintiff presented to Pathways Community Behavioral Healthcare, Inc. ("Pathways") on

October 19, 2009, for an intake screening. (Tr. 267). Plaintiff complained of mood swings,

racing thoughts, and depression. (Id.). Upon examination, plaintiff's mood was depressed, his

affect was congruent with his mood, and plaintiff's insight and judgment were intact. (Tr. 285-

86). Bhaskar Y. Gowda, M.D., diagnosed plaintiff with major depressive disorder, alcohol

dependency in early remission, and marijuana abuse in remission, with a current GAF score of 60

---

[12]Athlete's foot. Stedman's at 1991.

[13]Vistaril is indicated for the treatment of anxiety. See WebMD,
http://www.webmd.com/drugs (last visited November 15, 2012).

and a GAF score in the past year of 50. (Id.). Dr. Gowda prescribed Remeron,[14] Vistaril, and Wellbutrin. (Id.).

On October 20, 2009, plaintiff presented to We Care Clinic with complaints of left shoulder pain and headaches. (Tr. 254). Plaintiff was diagnosed with left trapezius strain, myofascial[15] pain, and hypertension. (Id.).

Plaintiff saw Dr. Northern on October 27, 2009, with complaints of left shoulder pain and headache. (Tr. 256). Plaintiff reported smoking one package of cigarettes a day for twenty-five years, drinking one pint of vodka a day until one week prior, and smoking marijuana until three months prior. (Id.). Upon examination, plaintiff's blood pressure was moderately elevated, tenderness was noted in plaintiff's left shoulder with limited abduction, and positive tinels sign[16] was noted. (Tr. 257). Dr. Northern diagnosed plaintiff with hypertension, which needed improvement, and noted that plaintiff was poorly compliant. (Id.). Dr. Northern also diagnosed plaintiff with carpal tunnel syndrome.[17] (Id.).

Plaintiff presented to Dr. Gowda on November 19, 2009, at which time plaintiff reported that he had been doing much better. (Tr. 265). Plaintiff's medications were adjusted. (Id.).

Mark Altomari, Ph.D., a state agency psychologist, completed a Psychiatric Review

---

[14]Remeron is an antidepressant indicated for the treatment of major depressive disorder. See PDR at 2924.

[15]Of or relating to the fascia surrounding and separating muscle tissue. Stedman's at 1272.

[16]A sensation of tingling or of "pins and needles," which indicates a partial lesion or early regeneration in the nerve. Stedman's at 1772.

[17]The most common nerve entrapment syndrome characterized by paresthesias, typically nocturnal, and sometimes sensory loss and wasting in the median nerve distribution in the hand. Stedman's at 1892.

Technique on January 20, 2010.  (Tr. 289).  Dr. Altomari found that plaintiff had the following impairments: schizophrenia, bipolar disorder II, major depressive disorder, mood disorder, PTSD, and alcohol dependence in remission.  (Tr. 291-95).  Dr. Altomari expressed the opinion that plaintiff had moderate limitations in his ability to maintain social functioning and maintain concentration, persistence, or pace; and mild limitations in his activities of daily living.  (Tr. 297).

Dr. Altomari also completed a Mental Residual Functional Capacity Assessment, in which he expressed the opinion that plaintiff had moderate limitations in his ability to understand and remember detailed instructions; carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting.  (Tr. 301-02).  Dr. Altomari stated that plaintiff has the ability to understand, remember, and carry out simple instructions.  (Tr. 303).  He stated that plaintiff can relate appropriately to co-workers and supervisors, but may optimally perform in a less social environment.  (Id.).  Finally, Dr. Altomari stated that plaintiff can adapt to changes in the workplace and make simple work-related decisions.  (Id.).

Plaintiff saw Stanley London, M.D. for an orthopedic evaluation on January 21, 2010. (Tr. 380-83).  Plaintiff complained of pain in his left shoulder, left neck, and left arm.  (Tr. 380). Plaintiff reported that Advil provides some relief.  (Id.).  Plaintiff reported that he was only able to

stand or sit for ten minutes. (Tr. 381). Plaintiff was a poor historian and received help from his

girlfriend. (Id.). Upon examination, plaintiff walked fairly normally, was able to heel and toe

walk, hop, squat, and get off and on the table with some discomfort. (Id.). Plaintiff had

tenderness at the sternoclavicular joint, the mid clavicle, and throughout the shoulder. (Id.).

Plaintiff had limitation of motion in the shoulder and neck. (Id.). Plaintiff's sensation was better

in his left hand. (Id.). Plaintiff's grip was adequate. (Id.). Dr. London's impression was: old

fractured clavicle healed; questionable fractured scapula on the left, healed; limited motion of the

left shoulder; degenerative changes in the rotator cuff; degenerative bone changes; limitation of

motion in the neck with radicular pain in his arm; and degenerative disc changes and degenerative

joint disease[18] in his neck. (Tr. 381-82).

Plaintiff underwent x-rays of the cervical spine on January 21, 2010, which revealed no

significant bony abnormality. (Tr. 385).

Plaintiff presented to Amy J. Marty, Ph.D., Licensed Psychologist, on January 21, 2010,

for a psychological evaluation. (Tr. 386-90). Plaintiff complained of anxiety, shoulder pain,

headaches, high blood pressure, depression, and anger problems. (Tr. 386). It was noted that

plaintiff's last employment ended in 2002 due to the company being transferred out of state. (Id.).

Plaintiff reported a history of mental health problems since he was a teenager, and that he had

received psychiatric treatment off and on since that time. (Id.). Plaintiff had been receiving

treatment at Pathways for the past four months, and was taking Wellbutrin, which decreased his

---

[18]Arthritis characterized by erosion of articular cartilage, either primary or secondary to
trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of
subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result.
Stedman's at 1388.

anxiety attacks and paranoia. (Tr. 387). Plaintiff reported feeling depressed most of the day, with symptoms of mood swings and feelings of worthlessness. (Id.). Plaintiff also reported hearing voices that were like a running commentary in his head, although he indicated he has "learned to cope" with them. (Id.). Plaintiff reported using alcohol last days prior, at which time he drank a pint of vodka. (Id.). Plaintiff indicated that he last used marijuana one year prior. (Id.). Upon mental status examination, plaintiff was coherent, relevant, logical, attentive, and polite. (Tr. 388). Plaintiff's speech was slower than normal and plaintiff was a slow processor, but no flight of ideas was noted. (Id.). Plaintiff's mood was mildly depressed and slightly anxious, and his affect was blunted and mood congruent. (Id.). No delusions or hallucinations were reported or noted and reality testing appeared adequate. (Id.). Plaintiff reported activities of daily living of grocery shopping, completing household chores, cooking, driving "a lot," and helping his girlfriend at work. (Tr. 389). Dr. Marty stated that plaintiff appeared to be socially isolated and only felt comfortable around his girlfriend and children. (Id.). Plaintiff was able to care for his personal needs. (Id.). Dr. Marty found that plaintiff evidenced mild difficulty in his ability to maintain adequate attention and concentration with appropriate persistence and pace. (Tr. 390). Dr. Marty diagnosed plaintiff with major depressive disorder, recurrent, moderate with psychotic features; panic disorder without agoraphobia; alcohol dependence in partial remission; learning disorder NOS, per client history; and a GAF of 65. (Id.). Dr. Marty found that plaintiff appeared competent, yet did not evidence good judgment to utilize benefits and funds should they be provided to him due to a long history of daily alcohol use. (Id.).

Plaintiff saw Dr. Gowda at Pathways on February 9, 2010, March 9, 2010, April 6, 2010,

and May 4, 2010, at which time Dr. Gowda managed plaintiff's medications. (Tr. 399-405).[19] (Id.).

Plaintiff presented to Dr. Northern on March 17, 2010, with complaints of headaches for several months. (Tr. 355). No abnormalities were noted on examination. (Id.). Dr. Northern diagnosed plaintiff with tension headache, and recommended that plaintiff lie in a darkened room and apply cold packs for pain. (Id.).

Plaintiff saw Dr. Northern on April 22, 2010, with complaints of left shoulder pain. (Tr. 351). Upon examination, mild to moderate tenderness was noted, and plaintiff's range of motion and strength were limited by pain. (Id.). Dr. Northern indicated that an MRI revealed subacromial[20] impingement. (Id.). Dr. Northern diagnosed plaintiff with subacromial impingement. (Id.). He administered a steroid injection. (Id.). Plaintiff presented for follow-up on May 13, 2010, at which time plaintiff reported neck pain as well. (Tr. 343). Dr. Northern administered another steroid injection. (Id.). On May 25, 2010, plaintiff reported that he had received about four days of relief with the last two injections. (Tr. 339). Dr. Northern diagnosed plaintiff with subacromial impingement and right elbow pain. (Id.). Dr. Northern recommended that plaintiff undergo an MRI of the shoulder. (Id.). On June 3, 2010, Dr. Northern recommended surgery, because the past two injections did not help. (Tr. 335).

Plaintiff presented to Dr. Northern on June 22, 2010, for treatment of hypertension. (Tr. 330). Plaintiff complained of difficulty regarding his short-term memory. (Id.). Dr. Northern's

---

[19]Dr. Gowda's treatment notes are handwritten and are difficult to read.

[20]Beneath the acromion, the outer end of the scapula, extending over the shoulder joint and forming the highest point of the shoulder, to which the collarbone is attached. See Stedman's at 1854.

assessment was hypertension stable. (Id.). He recommended that plaintiff undergo a CT scan. (Id.).

On June 30, 2010, Kevin Kline, D.O. performed left shoulder arthroscopy.[21] (Tr. 363). Plaintiff's diagnosis was subacromial impingement syndrome,[22] left shoulder. (Id.).

On July 15, 2010, plaintiff saw Bashar A. Mohsen, M.D., upon the referral of Dr. Northern, for complaints of decreased concentration and memory. (Tr. 419). Plaintiff reported seizures in the past that were likely alcohol-related. (Id.). Plaintiff indicated that he had been alcohol-free for six months. (Id.). Plaintiff denied any significant depression at that time. (Id.). Dr. Mohsen's impression was memory loss, multifactorial, very likely due to a combination of head trauma and a history of heavy alcohol use in the past. (Id.). Dr. Mohsen ordered an MRI of the brain. (Id.).

On September 8, 2010, Dr. Gowda completed a Medical Source Statement-Mental, in which he found that plaintiff has moderate limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule and be punctual, complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting

---

[21]Endoscopic examination of the interior of a joint. Stedman's at 162.

[22]Pain on elevating arm and tenderness on deep pressure over the supraspinatus tendon; due to pressure of an injured or inflamed subacromial bursa coming into contact with the overlying acromial process when the arm is elevated over the shoulder level. Stedman's at 1915.

behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use pubic transportation, and set realistic goals or make plans independently of others. (Tr. 407-08).

Dr. Gowda also completed a Medical Statement Concerning Schizophrenia for Social Security Disability Claim, in which plaintiff's diagnoses were listed as: major depressive disorder, generalized anxiety disorder, alcohol dependence in remission, and marijuana abuse in remission, with a current GAF score of 60. (Tr. 411). Dr. Gowda expressed the opinion that plaintiff was moderately impaired in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule and maintain regular attendance, complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and set realistic goals or make plans independently of others. (Tr. 412-13).

On September 23, 2010, plaintiff presented to the emergency room with complaints of headaches. (Tr. 429). Plaintiff was diagnosed with migraine headaches. (Tr. 430).

Plaintiff saw Susan Pereira, M.D. at Family Medicine Clinic on September 28, 2010, to establish care. (Tr. 437). Plaintiff complained of headaches, shoulder pain, dizziness, and pain in the knee, elbow, and feet. (Id.). No abnormalities were noted on examination. (Tr. 439). Susan Pereira, M.D. diagnosed plaintiff with headaches, possible allergies, dizziness, chronic joint pain, and skin condition of the feet. (Id.).

Plaintiff saw Dr. Pereira on October 28, 2010, for follow-up. (Tr. 432). Plaintiff reported

that his headaches had improved, although he still experienced dizzy spells. (Id.). Upon examination, Dr. Pereira noted crepitation[23] at the knees, but no redness or effusion; limited range of motion of the right shoulder consistent with impingement. (Tr. 433). Dr. Pereira diagnosed plaintiff with headaches, dizziness, and nasal obstruction. (Tr. 434). Dr. Pereira recommended that plaintiff undergo a CT scan of the sinuses. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since October 22, 2009, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: chronic myofascial pain; degenerative disc disease (DDD) and degenerative joint disease (DJD) of the cervical spine; DJD of the shoulders; migraines; hypertension (HTN); depression; and a history of drug and alcohol abuse (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) (lift and carry 20 pounds occasionally and lift and carry 10 pounds frequently) except that he is limited to work that: is performed in an indoor clean air work environment; allows for a sit/stand at will option in an 8-hour work day; and does not require climbing, repetitive overhead reaching, repetitive pushing and pulling with the arms, or exposure to heights or moving and dangerous machinery.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on July 30, 1965 and was 44 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

---

[23]Noise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions. Stedman's at 457.

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since October 22, 2009, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-25).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income protectively filed on October 22, 2009, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 25).


## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence

in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141

F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."

Id.

## B.     The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-

42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial

gainful employment."  If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the

claimant suffers from a medically severe impairment or combination of impairments.

 See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must

significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants

with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard report entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See

20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in determining plaintiff's RFC. Specifically, plaintiff argues that the ALJ erred in the following respects in determining plaintiff's RFC: (1) the ALJ relied on no medical evidence regarding plaintiff's physical capacities; (2) the ALJ failed to develop the record; (3) the ALJ improperly rejected the opinion of the treating psychiatrist; (4) the ALJ improperly rejected plaintiff's testimony; and (5) the ALJ failed to incorporate the entirety of restrictions he found present. Plaintiff also contends that, after improperly determining plaintiff's RFC, the ALJ relied on erroneous vocational testimony.

The ALJ made the following determination regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) (lift and carry 20 pounds occasionally and lift and carry 10 pounds frequently) except that he is limited to work that: is performed in an indoor clean air work environment; allows for a sit/stand at will option in an 8-hour work day; and does not require climbing, repetitive overhead reaching, repetitive pushing and pulling with the arms, or exposure to heights or moving and dangerous machinery.

(Tr. 21).

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc),

the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer v. Apfel, 245 F.3d 700, 704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); Eichelberger, 390 F.3d at 591.

In determining plaintiff's RFC, the ALJ first found that plaintiff's allegations of disabling pain and limitations were not entirely credible. This determination is reserved primarily for the ALJ. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). Plaintiff

argues that the ALJ improperly discredited plaintiff's subjective complaints.

The ALJ first discussed plaintiff's daily activities. (Tr. 22). The ALJ noted that, prior to undergoing left shoulder surgery in June 2010, plaintiff's activities of daily living were not limited to the extent one would expect given plaintiff's allegation of disabling symptoms. (Id.). The ALJ noted that plaintiff performed all aspects of personal care, drove extensively, cooked, did household chores, provided care for his children and family pets, did laundry, watched television, did word searches, performed household repairs, shopped for groceries, and handled money and bank accounts. (Tr. 22, 167-74, 389). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).

The ALJ next stated that Dr. London's objective findings on examination were minimal. (Tr. 22-23). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

The ALJ noted that plaintiff reported to Dr. London that over-the-counter pain medication provided pain relief. (Tr. 380). Evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints. See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999).

With regard to plaintiff's mental impairments, the ALJ noted that plaintiff has not received mental health treatment on a continual basis. (Tr. 23). This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

An administrative opinion must establish that the ALJ considered the appropriate factors.

See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain and limitations are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

Though the ALJ's credibility determination is supported by substantial evidence, the undersigned concludes that his RFC assessment was not based on a complete analysis. With regard to plaintiff's mental RFC, it is not clear from the ALJ's opinion whether the ALJ actually considered the opinion of Dr. Gowda, or what weight the ALJ placed on this opinion. This represents incomplete analysis and requires remand. See Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005) ("While a deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case, inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand.") (alteration in original) (citation omitted).

Under the regulations, treating physicians' opinions, especially those of Dr. Gowda because they were rendered so closely to the date the ALJ found plaintiff not disabled, are entitled to controlling weight, provided that they are well-supported: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 416.927(d)(2) (2006). The regulations further state that, "[u]nless we give a treating source's

opinion controlling weight . . . we consider all of the following factors in deciding the weight we give to any medical opinion. (1) Examining relationship . . . . (2) Treatment relationship . . . . (3) Supportability . . . . (4) Consistency . . . . (5) Specialization . . . . (6) Other factors . . . . 20 C.F.R. 404.1527(d).

On September 8, 2010, Dr. Gowda completed a Medical Source Statement-Mental, in which he found that plaintiff has moderate limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule and be punctual, complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use pubic transportation, and set realistic goals or make plans independently of others. (Tr. 407-08).

Dr. Gowda had been plaintiff's treating psychiatrist since October 2009. Dr. Gowda saw plaintiff approximately monthly for treatment of his mental impairments. Dr. Gowda diagnosed plaintiff with major depressive disorder and prescribed psychiatric medication. The ALJ, however, failed to discuss or even mention Dr. Gowda's opinion regarding plaintiff's mental limitations.

The Commissioner argues that it was permissible for the ALJ to give Dr. Gowda's opinion

- 26 -

less weight because it was unsupported by his treatment notes and inconsistent with other evidence. This explanation, however, is not suggested by the ALJ in his decision. In fact, the ALJ does not explain why he has ignored Dr. Gowda's limitations or the amount of weight he accorded Dr. Gowda's opinion. See 20 C.F.R. § 404.1527(d)(2) (even if a treating source is not given controlling wait, the ALJ should "always give good reasons in [his or her] notice of determination or decision for the weight [he or she] give[s] your treating source's opinion"). The ALJ only indicated that he was assigning "great weight" to the opinion of the non-examining medical expert, Dr. Pushalani, and accepted his testimony as credible and persuasive. (Tr. 23).

The ALJ's conclusion, which is inconsistent with Dr. Gowda's assessment, is unexplained. In a similar case, reversal was ordered. Brown v. Comm'r of Soc. Sec. Admin., 245 F. Supp.2d 1175, 1186-87 (D. Kan. 2003) (reversed when ALJ never explained why he made findings inconsistent with medical assessment nor did he acknowledge that he was rejecting portions of the assessment).

Of particular relevance are the limitations Dr. Gowda found regarding plaintiff's social functioning. Dr. Gowda found that plaintiff had moderate limitations in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior. (Tr. 408). The non-examining state agency psychologist, Dr. Altomari, also found that plaintiff had moderate limitations in his ability to maintain social functioning. (Tr. 297). In addition, consultative psychologist Dr. Marty found that plaintiff appeared to be socially isolated and only felt comfortable around his girlfriend and children. (Tr. 389).

In discussing the severity of plaintiff's mental impairments at steps two and three of the sequential evaluation process, the ALJ found that plaintiff had moderate difficulties in social functioning and noted that plaintiff was socially isolated, interacting only with his girlfriend and children. (Tr. 21). The ALJ did not, however, incorporate any social limitations in plaintiff's RFC. The ALJ's mental RFC is not supported by substantial evidence.

With regard to plaintiff's physical RFC, the ALJ stated that he concurred with the "State agency medical consultant's opinion" that plaintiff is not disabled, although he found that plaintiff's physical RFC was more consistent with less than a full range of light work. (Tr. 23).

The opinion to which the ALJ refers is that of Lindsey Struemph, a non-physician Single Decisionmaker. (Tr. 309). A single decisionmaker is not considered a medical source. See Gaston v. Astrue, 2012 WL 3045685, *2 (W.D. Mo. July 25, 2012). See also Kettering v. Astrue, 2012 WL 3871995, *21 (E.D. Mo. Aug. 13, 2012) (finding that ALJ did not err by failing to specify weight accorded opinion of "single decisionmaker" as "single decisionmaker" was a disability counselor and not an acceptable medical source as defined by the regulations). Indeed, it is error for an ALJ to consider a PRFCA by a single decisionmaker. See Andreatta v. Astrue, 2012 WL 1854749, *10 (W.D. Mo. May 21, 2012) (remanding case in which ALJ may have relied on PRFCA completed by single decisionmaker and referencing an agency policy that ALJs are not to evaluate in their opinions assessments by single decisionmakers). See also Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007) (remanding case in which ALJ evaluated the opinion of a lay person as a medical expert).

In this case, the ALJ erred in referring to the single decisionmaker as a "medical consultant." (Tr. 23). Further, there is no opinion in the record from any physician regarding

plaintiff's work-related limitations. Although Dr. London performed an orthopedic evaluation in January of 2010, he did not provide an opinion regarding plaintiff's functional limitations. Dr. London found that plaintiff had limitation of motion of the left shoulder and the neck. (Tr. 381). Significantly, plaintiff subsequently underwent shoulder surgery. (Tr. 363). There is no opinion from any physician, however, regarding how plaintiff's combination of physical impairments affect plaintiff's ability to work. Thus, the ALJ's physical RFC determination is not supported by substantial evidence.

The ALJ has the duty to develop the record, which includes developing the record as to the medical opinion of the claimant's treating physician. Higgens v. Apfel, 136 F. Supp.2d 971, 978 (E.D. Mo. 2001) (citing Brown v. Bowen, 827 F.2d 311, 312 (8th Cir. 1987). The ALJ is required to re-contact medical sources and may order consultative evaluations only if the available evidence does not provide an adequate basis for determining the merits of the disability claim. Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). While the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)). In this case, the ALJ erred in failing to develop the record regarding plaintiff's physical limitations.

In sum, the residual functional capacity determined by the ALJ is not supported by substantial evidence. The ALJ ignored the opinion of plaintiff's treating psychiatrist, which was more restrictive, and relied instead on the opinion of a non-examining medical expert. With regard to plaintiff's physical limitations, the ALJ appeared to rely on the opinion of a non-

physician single decisionmaker. No physician expressed an opinion regarding plaintiff's physical ability to function in the workplace. The hypothetical question posed to the vocational expert was based upon this flawed RFC.

As a result, the undersigned recommends that the decision of the Commissioner be reversed and this matter be remanded to the ALJ in order for the ALJ to obtain medical evidence addressing plaintiff's physical ability to function in the workplace, discuss and weigh the opinion of plaintiff's treating psychiatrist, and reassess plaintiff's residual functional capacity. After properly determining plaintiff's RFC, the ALJ should obtain testimony from a vocational expert to determine whether plaintiff is capable of performing work existing in significant numbers in the national economy.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.

Dated this <u>8th</u> day of January, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE